UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

        v.

PHILIP E. LOWERY,

    Defendant.

Case No. 1:05-cv-354

HONORABLE PAUL L. MALONEY

Magistrate Judge Ellen S. Carmody

---

## OPINION and ORDER

**Granting the Plaintiff's Motion for Summary Judgment;**

**Entering the Permanent Injunction Requested by the Plaintiff;**
**Directing Lowery to Provide an Accounting and Disgorge All Ill-Gotten Gains**

**Referring the Case to the Magistrate Judge for Determination of:**
Amount of Unlawful Gains to be Disgorged by Lowery, and Prejudgment Interest Thereon;
Civil Monetary Penalties, if any, Under 15 U.S.C. §§ 77t(d) and 78u(d)(3)

This is an action under the Securities Act, 15 U.S.C. § 77c and 77q, and the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, so the court has unquestioned federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff, the United States Securities and Exchange Commission ("SEC"), moves for summary judgment against the lone remaining defendant, Philip Eugene Lowery ("Lowery"). For the reasons that follow, the court will grant summary judgment to the SEC and issue the injunctive and other relief which it requests.

**BACKGROUND**

Defendant Philip Lowery, who is 77 years old, is a retired lawyer living in Colorado, while the late former defendant Gary L. Harden Senior was a Michigan resident. *See* Complaint filed May 19, 2005 ("Comp") ¶¶ 4-5. The SEC claims that between January 1999 and March 2001, Lowery and Harden violated the anti-fraud and registration provisions of the federal securities laws in connection with the sale of $5.8 million in interests in purported Colorado Registered Limited Liability Partnership ("RLLPs"). *See* Comp ¶ 2; Deposition of Philip E. Lowery dated September 25, 2008 ("Lowery Dep") (Ex N[1]) at 21-22; Philip E. Lowery's SEC Investigative Testimony dated Oct. 3, 2001 ("Lowery 10/2001 SEC Test'y") (Ex Z) at pp. 109-118 and 146-47 and 167 and Philip E. Lowery's SEC Investigative Testimony dated November 4, 2002 ("Lowery 11/2002 SEC Test'y") (Ex AA) at pp. 53-54; Gary L. Harden Senior's SEC Investigative Testimony dated May 23, 2002 ("Harden SEC Test'y") (Ex V) at pp. 387-88.

Lowery, an attorney, drew up an agreement which he and Harden executed, whereby Harden would serve as managing general partner ("MGP") of each of the RLLPs and would obtain on behalf of the RLLPs a 33% interest in the profits of each online casino; Harden was to give each RLLP a 27% share of the corresponding online casino's profits. For his part, Lowery would develop and manage the online casinos in exchange for about $510,000 in investor funds from the RLLP for each casino. Harden would manage the RLLPs through his company, Cyberspace, while Lowery would develop and manage the online casinos through *his* companies, Palancar LLC and Princeton Holdings LLC. *See* Lowery Dep (Ex N) at pp. 16, 21-24; *see also* Lowery 10/2001 SEC Test'y (Ex

---

[1]Unless otherwise indicated, an "Ex" refers to an exhibit attached to the plaintiff SEC's opening brief in support of its summary-judgment motion.

Z) at pp. 56-57, 87, 127-34, and Ex 12; *see also* Harden 11/13/2002 SEC Test'y (Ex W) at pp. 72 and Harden 11/14/2002 SEC Test'y (Ex X) at pp. 4-7.

Lowery and Harden raised about $5.8 million from more than 80 individual and corporate/partnership investors. Harden used some of this money to fund the ten RLLPs (each with three to twenty-eight investors) and forwarded $4.5 million to Lowery. *See* Lowery 10/03/2001 SEC Test'y (Ex Z) at pp. 133-37; *see also* Harden 11/15/2002 SEC Test'y (Ex Y) at pp. 120-158 and its Exs. 35 through 44; *see also* Declaration of Carolyn E. Kurr dated February 13, 2009 ("Kurr Dec") ¶ 2(a).

It is undisputed that Lowery and Harden failed to register any of the offers for, or sales of, those RLLP units with the SEC as required by Securities Act section 5. *See* Comp ¶ 2; *see also* Ex CC (Attestation of Non-Registration issued by SEC Records Officer Larry Mills on February 11, 2009); *see also* Harden 11/13/2002 SEC Test'y (Ex W) at p. 73 and its Ex 30. Harden formed and served as managing partner for all ten RLLPs and sold the RLLP units to investors, ostensibly to give them an opportunity to share in the profits of planned Internet casinos offering blackjack, slots, roulette, and video poker. Lowery solicited investors to buy the online-casino RLLP units, and he was to form and operate the online casinos. Harden and Lowery solicited more than eighty investors to purchase partnership units in ten RLLPs. *See* Comp ¶¶ 2, 4-5 and 11. Harden raised $550,000 to $750,000 for each of the ten RLLPs. *See* Comp ¶ 11.

According to the SEC, Lowery and Harden

targeted uneducated and financially unsophisticated, elderly investors using high-pressure sales tactics. In connection with their selling efforts, Harden and Lowery made false and misleading statements to investors. Specifically, some investors were provided with unrealistic profit projections . . . .

[O]thers were falsely told that their investments were guaranteed.

-3-

Investors were also led to believe that their money would be used for partnership and casino business expenses, but most of it was actually used to pay for personal expenses and to support Lowery's extravagant lifestyle.

Many of the investors liquidated retirement accounts and other conservative investments to invest in the RLLPs. Eventually, investors lost all of their money after the casinos were shut down due to operational problems.

* * *

All of the RLLP units were sold using the same techniques. Harden obtained the initial sales leads by sending mass mailings [which] advertis[ed] seminars on how to make money from the Internet, soliciting investors on Cyberspace's website and contacting his former insurance clients.

*Harden and Lowery then personally solicited investors in the RLLPs by speaking at these seminars and in follow-up meetings and telephone conversations with potential investors.*

Harden also made many door-to-door sales calls, soliciting investors at their homes. Harden provided potential investors with an information packet that included an offering memorandum, a sample registration form, a partnership agreement, and a ballot to elect Harden as managing partner. Many investors were also provided with a sales brochure. Harden closed the transactions by obtaining investors' signatures on the RLLP documents and collecting their money.

Although Harden was primarily responsible for procuring sales leads, conducting door-to-door sales calls and obtaining investors' complete paperwork, *Lowery also actively solicited investors by appearing as the featured speaker during certain seminars, including ones in Michigan and Iowa. At these seminars, Lowery gave presentations to potential investors describing the online casinos' business prospects and proposed operations.* Numerous individuals invested after hearing his presentations. Lowery also met with potential investors, spoke on the telephone to prospective investors who had questions about the online casinos (referred to him by Harden), and personally solicited one of his doctors to invest. (The doctor invested a total of $150,000 in three different RLLPs.)

*Lowery spoke particularly frequently to the managing partner of several partnerships that, with Lowery's encouragement, invested $2.74 million in the casino RLLPs* over a thirteen[-]month period. In addition, Lowery contributed to the content of the casino RLLPs' offering documents and the Cyberspace website, and reviewed and edited all of the offering documents' and website's content.

Comp ¶¶ 1 and 12-13 (some paragraph breaks added, italics added). Specifically, Harden confirmed

that RLLP sales materials drafted and approved by Lowery projected that each online casino would

earn a profit of about $2 million in the first year, $7 million in the second year, and $6.5 million in each of years three and four, for a total four-year profit of $22 million per RLLP. *See* Harden 11/13/2002 SEC Test'y (Ex W) at 73 and its Ex 30, as well as Harden 11/15/2002 SEC Test'y (Ex Y) at 59-71.

The SEC estimates that 60% of the investors were at least 60 years old, and 43% were at least 70 years old. *See* Comp ¶ 14. The SEC presents ample uncontradicted testimony that many of the investors had little formal education and little or no experience in investing or in operating a business, and many of them used their retirement funds to purchase the RLLP interests. *See* Declaration of Albert C. Emery dated April 15, 2002 ("Emery Dec") (Ex E); Deposition of Faye Dexter taken November 27, 2006 ("Dexter Dep") (Ex I) at pp. 6-7 and 10-11; Deposition of Helen Hutchins taken December 12, 2006 ("Hutchins Dep") (Ex K) at pp. 6-9 and 21; *see also* Deposition of Dorothy K. Kremer taken November 3, 2006 ("Kremer Dep") (Ex M) at pp. 1-3 and 35; Deposition of Dorothy C. O'Neill taken November 17, 2006 ("O'Neill Dep") (Ex O) at pp. 7-13; Deposition of June E. Rice taken November 13, 2007 ("Rice Dep") (Ex P) at pp. 7-9 and 16. Some of the investors were not even aware that they were investing in gambling websites. *See* Emery Dec (Ex E); Hoskins Dec (Ex G); Johnson Dec (Ex H); Hutchins Dep (Ex K) at 21; O'Neill Dep (Ex O) at 94.

**Lowery traveled to Michigan and gave presentations to prospective Michigan investors**, *see* Lowery Dep (Ex N) at pp. 41-42 and Lowery 11/04/2002 SEC Test'y (Ex AA) at pp. 55-57. In a criminal proceeding arising out of this same RLLP scheme, Lowery pled guilty to misdemeanor federal blackmail for demanding (after he learned that the SEC was investigating) that Harden destroy a videotape of one such sales presentation, in exchange for which Lowery would not inform

against Harden.  *See* Exs A, B and D (Judgment of Conviction and Sentence, Minutes of Guilty-Plea Hearing, and Superseding Information in *US v. Philip Lowery* (W.D. Mich.)).

**Lowery met several times with a major Florida investor, William Wimble ("Wimble")** and spoke with him at least ten times over the telephone regarding the RLLP interests.  Lowery told Wimble that the RLLPs' new online casino websites would ultimately earn $500,000 to $1 million *per month*, garnering fully *half* of the online casino market.  Wimble ultimately invested about $2.7 million in the RLLPs on his behalf and on behalf of others, nearly half of the total $5.8 million raised by Lowery and Harden.  *See* Lowery 10/03/2001 SEC Test'y (Ex Z) at pp. 154-159; *see also* Deposition of Wm. Wimble dated February 8, 2007 ("Wimble Dep 1") (Ex Q) at pp. 121-124 and its Exs 18 and 113-118; Deposition of Wm. Wimble dated February 9, 2007 ("Wimble Dep 2") (Ex R) at pp. 53-53 (recalling Lowery's oral projections of monthly profit and market-share) and its Ex 3 (Wimble's contemporaneous notes of those oral projections); and Deposition of Wm. Wimble dated March 30, 2007 ("Wimble Dep 3") (Ex S) at pp. 11-17 and 31-62 and its Exs 12, 13, 17-22, 25 and 26.

Essentially, t**he SEC alleges that Lowery and Harden's offering documents were internally contradictory, did not reflect the true state of affairs as to control of the RLLPs and the conduct of their business, and were part of an attempt to structure the RLLP transactions to avoid application of federal securities laws.**  On the one hand, each RLLP's partnership agreement required each investor to represent that he had "sufficient experience and knowledge of business affairs to allow him/her to intelligently exercise his/her powers as a partner"; stated that each investor was expected to actively participate in the partnership's business; and stated that each partner would be asked to serve on one or more committees to help oversee and conduct partnership

business.  *See* Comp ¶ 15.  More explicitly, each RLLP agreement required the investor to attest, when he signed,

> I specifically acknowledge and understand that I am a limited liability partner of this partnership and therefore any interest herein is not considered to be a security.  This interest has not been registered with the Securities and Exchange Commission nor any state securities department and I am afforded no protection under the Securities Act of 1933, or any similar state act relating to the offer and sale of securities.

Comp ¶ 15.  Despite the investor ("partner") declarations in the RLLP agreements, and the language encouraging or "expecting" the investors to actually exercise some day-to-day duties of partners and actively guide the partnership, the offering memorandum marketed the RLLPs as *passive* investments – more nearly the antithesis of the partnership suggested by the agreements themselves.  The offering memorandum assured investors, "This is a completely turnkey business."  Comp ¶ 16.

The SEC alleges that not only did Lowery and Harden *market* the RLLP "unit" purchases as passive arrangements involving the purchase of a security rather than a real partnership, they also *operated* the RLLPs that way.  When soliciting new investors, Lowery and Harden touted Lowery's business acumen and explained that he would run the online casinos.  *See* Comp ¶ 16.

On the tactical and day-to-day operational side, the investors universally affied that they were depending (and led to depend) not on their own participation in and guidance of the RLLPs or the underlying casinos, but on Lowery's touted business experience and his ability to develop and operate the online casinos at a profit, in order to receive any return on investment.  *See* Dexter Dep (Ex I) at pp. 29-30; *see also* Emery Dec (Ex E)and Declaration of Aaron F. Faltin dated March 1, 2002 ("Faltin Dec") (Ex F), Declaration of Russell R. Hoskins dated February 8, 2002 ("Hoskins Dec") (Ex G), and Declaration of Mary A. Johnson dated February 4, 2002 ("Johnson Dec") (Ex H); Deposition of Robert T. Haarala taken November 14, 2006 ("Haarala Dep") (Ex J) at pp. 67-71;

Deposition of Helen Hutchins taken December 12, 2006 ("Hutchins Dep") (Ex K) at pp. 24-27;

Deposition of Linda Irwin taken October 23, 2006 ("Irwin Dep") (Ex L) at pp.64-66; O'Neill Dep

(Ex O) at pp. 42-43 and 51-52; Rice Dep (Ex P) at pp. 26-27; Wimble 2/8/2007 Dep (Ex Q) at pp.

61-63 and 106; Wimble 2/9/2007 Dep (Ex R) at pp. 70-71; and Youse Dep (Ex T) at p. 24.

The SEC explains in further detail, without specific contradiction from Lowery, how the two

men *actually treated* the RLLP purchases as just that – purchases of a security – rather than the

partnership they portrayed in the RLLP agreements:

> *Lowery and his entities (Palancar and Princeton Holdings) were also prominently mentioned in the sales brochure that was distributed to investors, further indicating that the success or failure of the ventures depended on Lowery's efforts.*
>
> The offering materials also state that Harden, as managing partner, would perform all significant duties for the RLLPs. In practice, investors were not kept informed about the progress of the casinos or otherwise involved in the underlying business. The only partnership business conducted by the investors was their "vote" on two perfunctory matters (to elect Harden as managing partner of the RLLP and to close the partnership to additional investors).
>
> Harden never held any partnership meetings for the RLLPs or established any committees. In fact, investors typically were not even given the names of the other partners. Moreover, due to their lack of [financial] sophistication, the majority of the investors in the casino RLLPS could not intelligently exercise any partnership powers they theoretically might have had.
>
> *Finally, Lowery (rather than Harden or the partnerships) controlled the casinos. The agreements between the RLLPs and Lowery [for Lowery to operate the online casinos]. did not bestow <u>any</u> power to control the casinos on individual partners, or on the partners acting collectively.* Thus, even before Lowery stopped operating the casinos, there was no business for the investors to manage.

Comp ¶¶ 16-17 (italic emphasis added, paragraph breaks added, underline emphasis in original).

*See also* testimony that investors typically did not know who their co-partners were and how to

contact them: Harden 11/14/2002 SEC Test'y (Ex X) at pp. 91-92; Decs of Emery,. Faltin, Hoskins,

and Johnson (Exs E-H); Haarala Dep (Ex J) at pp. 69-70; Irwin Dep (Ex L) at p. 64; Rice Dep (Ex

P) at p. 27; and Youse Dep (Ex T) at p. 16. At least four investors state that when they tried to contact Harden, in his role as general managing partner of their RLLPs, to check on the status of their investments, they were unable to reach him. *See* Dexter Dep (Ex I) at p. 24; *see also* Haarala Dep (Ex J) at 68-71; Hutchins Dep (Ex K) at p. 20; O'Neill Dep (Ex O) at p. 90; and Youse Dep (Ex T) at pp. 23-24.

Lowery admitted that the RLLPs and the supposed "partners" therein were not intended to manage or operate the online casinos in any way. *See* Lowery 10/03/2001 SEC Test'y (Ex Z) at pp. 55-57 and 134. Lowery further admitted that the investors did not have any ownership interest in the casinos themselves, nor in his development and management companies; rather their putative "ownership" interests consisted only of a right to a minority percentage of the casinos' *profits*. *See* Lowery 10/03/2001 SEC Test'y (Ex Z) at pp. 233-234. In addition, the RLLP partnership documents gave Harden, as managing general partner, the *exclusive* right to exercise managerial control and *exclusive* authority to bind each RLLP to agreements, *see* Harden 11/13/2002 SEC Test'y (Ex W) at p. 73 and its Ex 30 (offering memorandum) at 8 and 10. The RLLP documents also provided that "only the Partners acting in fact for an RLLP [only Harden, as managing general partner of all the RLLPs] are liable for actions taken on behalf of that RLLP . . . ." Harden 11/13/2002 SEC Test'y (Ex W) Ex 30 (offering memorandum) at 8.

Moreover, according to the uncontradicted testimony of former codefendant Harden and major investor Wimble and others, the RLLPs never held partnership meetings, never formed the committees referred to in the offering memoranda, and never made books and records available for "partner"-investor review, and the investors never interacted with each other. *See* Harden 11/14/2002 SEC Test'y (Ex J) at pp. 79-80; *see also* Dexter Dep (Ex I) at pp. 29-30; *see also*

Haarala Dep (Ex J) at pp. 67-70; *see also* Hutchins Dep (Ex K) at pp. 24-26; *see also* O'Neill Dep (Ex O) at pp. 51-52; *see also* Rice Dep (Ex P) at pp. 26-27 and 33; *see also* Emery Dec, Faltin Dec, Hoskins Dec, and Johnson Dec (Exs E-H). Lowery himself opined that the investors had no right to know how he spent $1.9 million-plus of their capital, namely on matters wholly unrelated to operating or developing the business of the RLLPS' online casinos ($1.5 million to develop casinos for his own account, and over $400,000 for the couple's residence, lifestyle, travel, and other personal expenses). *See* Lowery 11/04/2002 Sec Test'y (Ex AA) at pp. 80-83.

According to Harden, the investor-"partners" voted on, at most, three issues: the "selection" of the managing general partner of the RLLP (which the initial paperwork pre-designated as Harden, with no other choices listed), whether to close the partnership to additional investors after raising the desired funds, and whether to sell the online casinos after several years of unprofitable and sporadic operation. *See* Harden 11/13/2002 SEC Test'y (Ex W) at pp. 73-74 and Harden 11/14/2002 SEC Test'y (Ex X) at pp. 83-87 and its Ex 32. Even that limited number of partner/investor votes is suspect based on this record. The SEC points out that no ballots are in the record to show that the investors ever actually voted on whether to close any of the RLLPS to additional investors, *see* MSJ at 7, and it logically emphasizes that the investor/partner vote on whether to sell the failed casinos[2] occurred only after Lowery and Harden knew the SEC was investigating and so cannot be evidence of their normal business practices during the relevant period, *id.* (citing Harden 05/22/2002 SEC

_____

[2]

After the RLLPs' online casinos shut down, Lowery sold the rights to the casinos to a third party in exchange for a 15% share in any future profits. The third party never re-started the casinos and they never generated any income. *See* Lowery Dep (Ex N) at 35 and Lowery 11/04/2002 SEC Test'y (Ex AA) at 38-47 and 50-52 and its Ex 100. The record contains no evidence that Lowery conveyed any of his right to the future profits to the RLLP investors, who, after all, had a right to a share of the casinos' profits under the terms of the RLLPs.

Test'y (Ex U) Ex 1 and Harden 11/14/2002 SEC Test'y (Ex X) Ex 32.

In other words, the undisputed evidence shows that

despite the language of the subscription agreements, the Retrieval RLLP structure was essentially that of a limited partnership with a general partner charged with conducting all the partnership affairs and multiple limited partners whose role is limited to contributing funds for the investment and receiving a share of the profits. In the Retrieval RLLP scheme, Harden was the general partner and the investors were the limited partners.

MSJ at 6-7.

**The SEC also proffers a series of statements by Lowery and Harden which it characterizes as misrepresentations and misleading omissions:**

- During initial sales seminars, Lowery and Harden said they expected each RLLP to generate about $300,000 to $600,000 within six months.

- The offering memoranda provided to prospective investors in connection with some of the RLLPs included a table entitled "Internet Casino License Projections", which indicated that a new online casino would generate about $22 million in revenue and $11 million "owner's share" over four years, even though Lowery and Harden had no gambling/gaming experience and no historical revenue and profit figures on which to base their projections.

- **While Lowery and Harden were selling the later RLLPs, they knew (or were reckless in not knowing) that their online casinos already had significant operational problems which made their revenue and profit forecasts very untenable. Software** problems delayed the start of online operations until 2000, two years after Lowery and Harden began soliciting investors. The websites operated for only one year and even then were not operational for 7-8 of the 12 months due to technical problems.

- Even when operating, the casinos generated no profits, yet Lowery & Harden continued to tell prospective investors the RLLPs would generate monthly profits.

- **The sales brochure provided to investors represented that** "The potential returns of an RLLP casino are enormous" and "The partners will share a percent of the monthly casino net drop [p]aid monthly."

- **The sales brochure promised that** "at the end of thirty-six (36) monthly payments, monthly payment will terminate and the net revenue interest will be bought-out per a contractual agreement for the original purchase price of five hundred ten thousand dollars." Lowery and Harden did not revise the sales brochure even after it became evident that the casinos had ongoing major difficulties and were not profitable.

- **When convincing the managing partner of several partnerships to invest $2.74 million in the RLLPs over a 13-month period, Lowery made materially false and misleading statements, such as:**

    (1)    Lowery was already operating profitable casinos;

    (2)    Lowery was buying up to three casinos per month with his own money and had set aside $16 million to buy more;

    (3)    Lowery was contributing at least $600,000 advertising per casino;

    (4)    Lowery expected to lose money on the casinos due to personal expenditures, but he planned to buy back the casinos from the investors after 3 years and either sell them or "take them public" at a large profit;

    (5)    The "President of Budweiser" offered to buy his casino business for $1 billion but he was not ready to sell.

- **The sales brochure stated that "[f]unds are being sought to create and lease internet casino sites, customized graphics and advertising," suggesting that the investors' money would be used to provide capital for the online casinos. In fact, none of the $5.8 million collected from investors was used to provide capital for the casinos:** $4.5 million was deposited in Lowery's "Palancar LLC" accounts and then transferred to his "Princeton Holdings LLC" account, and $1.3 million was paid to Harden-controlled companies.

About $1.5 million was transferred into an account jointly owned by Lowery and his wife, then used to pay their personal expenses, including (1) $500,000 in back taxes; (2) a down-payment on a condominium in Colorado; (3) appointments with a masseuse and personal-fitness trainers; (4) maintenance of a horse, llama, fish, and lakes and waterfalls at the Lowerys' three-acre home property; (5) new BMW and Mercedes automobiles; and (6) international travel and hotels in London, Vietnam, the Philippines, Belize, Curacao, Costa Rica, the Bahamas, the Isle of Jersey in the U.K., San Francisco CA, and Las Vegas NV.

*See* Comp ¶¶ 18-20 and 24-25.[3]

---

[3]Paragraphs 21-23 of the complaint pertain only to defendant Gary Harden, who has died.

**The SEC complaint's allegations regarding Lowery's material misrepresentations and omissions are supported by the uncontradicted testimony of Lowery and Harden themselves.**

*See* Harden 05/23/2002 SEC Test'y (Ex V) at pp. 393-400 and 432-433 (agreeing that the sales brochure and website promised prospective investors that their RLLP interest would be "bought out" after 3 years, at the original purchase price, and that Lowery drafted and approved these materials) and Lowery 11/04/2002 SEC Test'y (Ex AA) at p. 79 (admitting that he had no gaming experience on which to base profit projections). *See also* Lowery 11/04/2002 SEC Test'y (Ex AA) at 59 (contrary to Lowery's alleged claim to Wimble that he was developing three casinos *per month* just for himself, Lowery testified that in his life he had tried to develop only 16 casinos, including the ten for the then RLLPs and just six for himself); Lowery 11/04/02 SEC Test'y (Ex AA) at pp. 59-60, 80-83, 170-174, and 195-197 and Lowery 11/05/02 SEC Test'y (Ex B) at pp. 5-8, 56-57, 70 and 74 (confirming Lowery's diversion of $430,000 for personal expenses or investments unrelated to the RLLPs and corresponding casinos, and his transfer to his wife of $1.5 million which he then spent to develop six online casinos in his own name rather than that of the "partnerships").[4]

---

[4]

In testimony before the SEC, Lowery expressed his position that, notwithstanding this written promise in the sales brochure and website, he was not obligated to buy back the RLLPs at their purchase price. Lowery reasoned that because the casinos were never profitable (and went out of business after far less than three years of operation) therefore never made the requisite 36 months of payments. *See* Lowery 11/04/2002 SEC Test'y (Ex AA) at pp. 97-102. Lowery's opposition brief says nothing about this issue except to note, with unclear relevance, "Lowery's 'buy-back' guarantee was clearly set forth in his contract with Cyberspace [Harden's company]." Def's Opp at unnumbered page 3, first full unnumbered paragraph.

Both Lowery and Harden admitted, however, that they never disclosed this interpretation of the contingent nature of the buy-back promise to investors. *See* Lowery 10/03/2001 SEC Test'y (Ex Z) at pp. 127-134 and Harden 05/23/2002 SEC Test'y (Ex V) at pp. 393-400 and 432. The court finds that this was an omission of information which Lowery knew was material. That is, Lowery had to know that the true nature and extent of the buy-back guarantee was likely to influence the investors' decisions about whether to buy an interest in the RLLPs, how much of an interest to buy,

**And Wimble further testified that Lowery claimed he had a large "pot" of money to spend advertising the online casinos, had reserved $16 million to finish this casino project, and had paid $2 million to acquire a list of almost 4 million e-mail addresses,** presumably to generate new customers for the online casinos, *see* Wimble Dep 3 (Ex S) at pp. 11-17 and 31-62, and its Exs 12-13, 17-22 and 25-26 (Wimble's contemporaneous notes of Lowery's oral statements). Those representations are starkly contradicted by the Lowerys' sworn personal financial statements of April 2004, *see* Exs FF and GG. Neither statement lists any interest or drawing rights in any trust fund, or income from trust funds, or assets, anywhere remotely approaching $1 billion. Rather, the SEC's reviewer of these records swears, without contradiction by Lowery,

> These records show that at most, the couple's assets totaled approximately $4 million (apart from any inflows of funds from the Retrieval RLLP investors). [T]he great majority of the couple's assets were highly illiquid, consisting of a primary residence valued at $1.1 million and the income from a promissory note with a face value of $2.3 million, with interest and payable on a monthly basis over a fourteen year period.

Kurr Dec ¶ 2c. Likewise, the SEC's reviewer of the financial records of the RLLPs, the Lowerys, and associated entities states, without specific contradiction by Lowery, that the records show Lowery deposited at most $250,000 into accounts related to the online casinos, with nothing to suggest he paid $2 million for an e-mail list or set aside or had access to $16 million to develop, advertise, or operate the casinos. *See* Kurr Dec ¶¶ 2d and 2e.

In any event, due to software and other problems, the online casinos underlying the RLLPs were shut down shortly after the began operating; none of them ever generated any profits, and none of the RLLPs made any payments to the 80-plus investors, *see* Comp ¶ 11, and none of the investors

---

and whether to demand additional information before making those decisions.

received any proceeds from the sale of the failed casinos, *see* Lowery Dep (Ex N) at p. 35.

An essential premise of the SEC's case is that the RLLP units which Lowery and Harden sold to investors were "securities" as the term is defined by section 2(1) of the Securities Act, 15 U.S.C. § 77b(1). *See* Comp ¶ 27. **Count one asserts a claim under sections 5(a) and 5(c) of the Securities Act.** Specifically, the SEC claims that Lowery violated 15 U.S.C. §§ 77e(a) and 77e(c) by doing the following things without filing a registration statement for the RLLP units: (1) used mail and other means of transport and communication to sell the securities, or caused those securities to be carried in the mail or in interstate commerce for the purpose of sale or delivery after sale, and (2) used the means of transport or communication in interstate commerce or in the mails to sell or offer to sell the securities. *See* Comp ¶ 28.

**Count two asserts a claim under section 17(a) of the Exchange Act,** 15 U.S.C. § 77q(a) ("Fraudulent Interstate Transactions" - "Use of Interstate Commerce for Purpose of Fraud or Deceit"). **Count three asserts a claim under section 10(b) of the Exchange Act and Rule 10b-5** thereunder, i.e., 15 U.S.C. § 78j(b) ("Information Required in Prospectus" - "Summarizations and Omissions Allowed by Regulations") and 17 C.F.R. § 240.10b-5 ("Employment of Manipulative and Deceptive Devices"), respectively. In both counts, the SEC claims that Lowery, when offering or selling securities through the mail or other means of interstate commerce, employed schemes to defraud, obtained money by misrepresentations or omissions of material fact, or engaged in transactions or business practices which operated as a fraud or deceit on the purchasers of the securities. *See* Comp ¶¶ 30 and 32.

**PROCEDURAL HISTORY**

In May 2005 the SEC filed the complaint against seven defendants: Lowery and his wife Erma J. Lowery, two entities owned by Lowery (Palancar LLC and Princeton Holdings LLC), Gary L. Harden Senior and his company Cyberspace Ltd., and Development Investments and Associates Inc. *See* Doc. No. 1. In October 2005, the Honorable Richard Alan Enslen, Senior United States District Judge, dismissed three defendants without prejudice for lack of personal jurisdiction: Erma J. Lowery, Princeton Holdings LLC, and Palancar LLC. *See* Doc. Nos. 32 (opinion) and 33 (order). In July 2006, Judge Enslen granted the SEC's application for default judgment against two defendants, Cyberspace Ltd. and Development Investments and Associates Inc. *See* Doc. Nos. 82 (motion) and 86 (judgment). That left only Lowery and Harden as defendants.

In December 2006, the Honorable Ellen S. Carmody, United States Magistrate Judge, stayed the case pending the conclusion of *US v. Philip Lowery and Gary Harden*, Criminal Case No. 1:2006-104 (W.D. Mich.) ("the criminal case"). *See* Doc. No. 105. In March 2008, Magistrate Judge Carmody permitted Lowery's counsel to withdraw from the case. *See* Doc. No. 114. The case was reassigned from Judge Enslen to this judge, who directed the SEC to file a status report upon completion of the criminal case.

Lowery went to trial on an indictment, but after the jury had been empaneled and started to hear testimony, he pled guilty to a superseding indictment charging him with one misdemeanor count of blackmail in violation of 18 U.S.C. § 873, defined as "knowingly and willfully demand[ing] a valuable thing as consideration for not informing on a violation of law of the United States." Specifically, in exchange for not telling law enforcement that Harden had committed federal mail fraud and wire fraud, Lowery demanded that Harden destroy a videotape of Lowery making a presentation to potential investors regarding an Internet gambling venture. *See* Ex D (Superseding

Information dated Dec. 5, 2007).

Although Lowery was subject to a potential prison term of one year and a fine of $100,000, the government did not seek prison time and the Honorable Janet T. Neff, United States District Judge, did not impose any. Rather, at the May 2008 sentencing, Judge Neff required Lowery to pay $500,000 in restitution and a $2,500 fine, with interest waived on both. Lowery's restitution payments are to be distributed on a *pro rata* basis to investors in Registered Limited Liability Partnerships ("RLLPs") described in the indictment who invested in or after May 2000. *See* Exs. A and B and C (Criminal Case No. 1:06-104, Doc. No. 102 (Dec. 5, 2007 Criminal Minute Sheet from Plea Hearing) and Doc. No. 115, Ex A (May 8, 2008 Judgment of Conviction) and Doc. No. 101 (Lowery's Plea Agreement) ¶¶ 1, 2, 5a, and 6.

Also in May 2008, the court granted the SEC's motion to voluntarily dismiss the claims against Harden, who had died. *See* Doc. Nos. 115 and 120. That left only Lowery as a defendant.

Magistrate Judge Carmody held a case management conference and issued a scheduling order in June 2008. In August, October and November 2008, the court granted the SEC's motions for extensions of time in which to conduct discovery and file dispositive motions, and in February 2009 the court granted the SEC a further extension of time in which to file a dispositive motion. *See* Doc. Nos. 126, 130, 133 and 136. The SEC filed the instant motion for summary judgment in February 2009, Lowery filed an opposition brief in March 2009, and the SEC filed a reply brief in *See* Doc. Nos. 138 (SEC's motion), 140 (Lowery's opposition), 143 (extension of time order), and 144 (SEC's Reply). Magistrate Judge Carmody held a settlement conference on June 25, 2009 but the case did not settle. *See* Doc. No. 147.

Lastly, with an extension of time, on Friday, July 10, 2009 the SEC filed a proposed pretrial

order.  The pretrial conference was scheduled for Monday, July 13, 2009, with a bench trial to commence on Tuesday, July 28, 2009, but today's order cancels those proceedings.

**DISCUSSION**

Preliminarily, the court notes that in ruling on summary judgment, it is entitled to consider sworn testimony given by Lowery and others in the course of the SEC's investigation on the same basis as other competent deposition or affidavit evidence. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 34 n.5 (2d Cir. 1978) ("Sworn testimony taken in an SEC investigation may be used pursuant to Rule 56(c) on a motion for summary judgment"); *SEC v. Am. Commodity Exchange, Inc.*, 546 F.2d 1361, 1369 (10th Cir. 1976) (SEC investigative testimony is the same as affidavit evidence on a motion for summary judgment).  *See, e.g., SEC v. K.W. Brown & Co.*, 555 F. Supp.2d 1275, 1296-98 (S.D. Fla. 2007) (considering sworn testimony that civil defendant gave during SEC investigation, and noting how it contradicted his later trial testimony), *order supplemented* (S.D. Fla. Jan. 4, 2008) (not available in F. Supp.2d or on WestLaw); *SEC v. Bolla*, 401 F .Supp.2d 43, 51-52 (D.D.C. 2005) (considering sworn testimony that civil defendant gave during SEC investigation, and noting that it contradicted his earlier statement to the SEC), *aff'd in part and rev'd in part o.g.*, 475 F.3d 392 (D.C. Cir. 2007); *SEC v. General Refractories Co.*, 400 F. Supp. 1248 (D.D.C. 1975) (John Pratt, J.) (sworn affidavits and *investigatory transcripts* were properly admitted as probative evidence at preliminary-injunction hearing; "The factual findings resulting from the SEC's review of such records are presented in the form of affidavits and transcripts.  Under Rule [of Evidence] 803(8), such findings are presumptively valid and reliable unless it is determined that the circumstances indicate a lack of trustworthiness as to the information contained therein.  There is

no evidence to indicate such a lack of trustworthiness.").

**On count one, Lowery fails to create a genuine issue of material fact as to any of the elements of the SEC's claim under sections 5(a) and 5(c) of the Securities Act.**  Specifically, Lowery does not present evidence which would enable a reasonable factfinder to find that he did not violate 15 U.S.C. §§ 77e(a) and 77e(c) by doing the following things without filing a registration statement for the RLLP units:  (1) using mail and other means of transport and communication to sell the securities, or causing those securities to be carried in the mail or in interstate commerce for the purpose of sale or delivery after sale, and (2) using the means of transport or communication in interstate commerce or in the mails to sell or offer to sell the securities.  *See* Comp ¶ 28.

Securities Act section 5(a), which is codified as title 15 U.S.C. § 77e(a), is entitled Sale or Delivery After Sale of Unregistered Securities, provides:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly –
>
> (1)      to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
>
> (2)      to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

Securities Act section 5(c), which is codified as title 15 U.S.C. § 77e(c) and entitled Necessity of Filing Registration Statement, provides as follows:

> It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title [15 U.S.C. § 77h].

-19-

The court first finds that the RLLP interests sold by Lowery and Harden qualify as "securities" for purposes of the statutes in count one, as well the statutes in counts two and three. As our Circuit has explained,

> The courts have found that many investment schemes fall within the definition of security as defined by the Securities Act and the Securities Exchange Act. As the Supreme Court stated in *Tcherepnin v. Knight*, 389 U.S. 322 . . . (1967), "In searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Id.* at 386 . . . . Court have relied on this directive to look beyond the terms of the parties' agreement to determine whether a security was involved.

*SEC v. Prof. Assocs.*, 731 F.2d 349, 354 (6th Cir. 1984) (Engel, Kennedy, <u>Sr. Cir. J. Bailey Brown</u>).

Accordingly, in determining whether Lowery and Harden's Colorado RLLP interests constituted securities, the court is entitled to consider not only the terms of the RLLP purchase documents or partnership agreements, but also the sales brochures, websites, and other promotional materials used to inform purchasers about the nature of the interest. *See SEC v. Prof. Assocs.*, 731 F.2d at 354 ("In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975), the Supreme Court was called upon to decide whether shares of a cooperative housing project, sold to residents of the project, were securities. The Court, in making its decision . . . , relied not only on the agreements between the parties involved but also on an information bulletin published to attract investors. In light of the specific holding of . . . *Forman* . . . and the Court's general directive in . . . *Tcherepnin* . . . , we hold that the district court acted properly in considering the promotional brochure in making its determination that securities were offered and sold.").

By the same token, the court will also consider the testimony of Lowery, Harden, investor Wimble, and the other investors recalling oral statements by Lowery and Harden which shed light on the *true* nature of the RLLP interests. *See SEC v. Prof. Assocs.*, 731 F.2d at 355 ("We conclude

that the district court did not err in allowing the oral testimony as to the actual operation of the trusts to show that there was a common enterprise [the second of the three elements of a 'security' under these Acts].") (citing *Curran v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216 (6th Cir. 1980) (Lively, Engel, Sr. Cir. J. Phillips) (in reaching conclusion that a discretionary commodity account was not an "investment" contract [the first of the three elements of a 'security' under these Acts] because there was no actual pooling of investors' funds, the court relied not only on the terms of the parties' agreements, but also on the testimony of two of defendants' employees that plaintiffs' money had not actually been commingled with that of other investors)).

Even if the Supreme Court had not remarked that a "security" is "a flexible concept which may encompass a wide variety of schemes", *Prof. Assocs.*, 731 F.2d at 355 (citing *Tcherepnin v. Knight*, 389 U.S. 322 (1967)), this court would not hesitate to find that the Colorado RLLP interests offered and sold by Lowery were securities for purposes of the statutes underlying all the SEC's claims. Securities Act § 2(a)(1) and Exchange Act § 3(a)(10) provide essentially identical definitions of "security." *See SEC v. Great Lakes Equities Co.*, 1990 WL 260587, *21 (E.D. Mich. Sept. 4, 1990) ("The definition of 'security' in Section 3(a)(10) of the Exchange Act is virtually identical to the definitional sections of the Securities Act and for present purposes the two acts may be considered the same.") (citing *Reves v. Ernst & Young*, 494 U.S. 56 (1990)), *app. dismissed*, Nos. 91-1354, 91-1405 and 91-1525, 933 F.2d 1009, 1991 WL 88417 (6th Cir. May 28, 1991) (table entry), *aff'd*, Nos. 92-1433 and 92-1565, 12 F.3d 1214, 1993 WL 465161 (6th Cir. Nov. 10, 1993). Both Acts define a security to include investment contracts, which in turn are defined as any contract which constitutes (1) an investment (2) in a common venture (3) with the expectation of profits from the efforts of others. *See Stone v. Kirk*, 8 F.3d 1079, 1085 (6th Cir. 1983) ("the test for determining

whether a particular financial arrangement constitutes an investment contract is whether it entails: 'an investment in a common venture premises on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'") (quoting *Forman*, 421 U.S. at 852).

On the first element of a "security", it is undisputed that Wimble *et al.*'s purchases of the Colorado RLLP interests were an "investment", as each interest afforded the purchaser the potential to earn a return and subjected him to the risk of loss – and indeed Wimble and the other investors lost everything they invested. *See generally SEC v. Edwards*, 540 U.S. 389, 393 (2004) (the term "investment contract" is "'a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits'") (quoting *SEC v. W.J. Howey & Co.*, 328 U.S. 293, 299 (1946)); *see, e.g., Stone v. Kirk*, 8 G.3d 1079, 1085 (6th Cir. 1993) (interests in joint ventures were investments where the funds used to purchase the interests were pooled and enabled the defendant-seller to engage in the venture's business (leasing the right to license "master recordings" and manufacture them on physical media, at the time record albums and cassette tapes) on their behalf); *SEC v. Friendly Power co., LLC*, 49 F. Supp.2d 1363, 1368-69 (S.D. Fla. 1999) (the term "investment" refers to any arrangement "whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses.").

On the second element of a "security," it is undisputed that Wimble and the other investors pooled their purchase funds in a common venture, i.e., the particular RLLP in which they bought interests. The investors expected and intended that the aggregation of the funds would enable Lowery and Harden to create and profitably operate an online casino whose profits were contractually designated to flow partially to their RLLP. Indeed, Lowery and Harden led the

purchasers to believe that the invested funds would be used for precisely that purpose.  <u>On the third element of a "security", it is undisputed that Wimble and the other investors purchased the RLLP interests with the reasonable expectation of profits to be derived from the "entrepreneurial or managerial skills of others"</u>, namely Lowery's alleged business and casino experience and his skills in creating, operating, publicizing and expanding the corresponding online casino (which would owe 33% of its profits to their RLLP).

Moreover, the SEC presents a recent published appellate decision which squarely held that interests in a Colorado RLLP constitute investment contracts, and hence securities under the circumstances, whenever even one of these criteria are met: (1) the RLLP was similar in structure to a limited partnership, meaning that the partners had to vote for a particular managing partner and had no practical ability to conduct the RLLP's business, partly because they were geographically dispersed and had no pre-existing relationship with each other, *or* (2) the partners had little or no experience in the business affairs of the RLLP, *or* (3) the partners were so dependent on the unique entrepreneurial or managerial skill of the seller or promoter that they could realistically replace him or exercise meaningful partnership powers.  *See SEC v. Merchant Capital*, 483 F.3d 747, 755 (11th Cir. 2007).  For the same reasons that the 11th Circuit found all three of these criteria to be satisfied in *Merchant Capital*, 483 F.3d at 765, this court finds all three criteria to be satisfied here.  As in *Merchant Capital*, the supposed partners in the RLLPs were given no choice but to "elect" a pre-selected person as the general managing partner of their RLLPs (here, Harden); and they had little or no voice in the management of the RLLPs or the underlying business (i.e., no way to meaningfully direct or even influence Harden's management of the RLLPs or Lowery's operation of the underlying online casinos), and no practicable, legally enforceable way to replace either

Harden or Lowery.

Finally, the SEC presents expert testimony that the "Retrieval" Colorado RLLPs sold by Lowery and Harden qualify as investment contracts and thus as securities under these Acts. Lowery has not challenged the relevant expertise and experience of Mark J. Lowenstein, Esq. – a University of Colorado securities and corporate law professor who has taught these subjects for about thirty years, gave trial or deposition testimony in at least seven federal and state cases in this field since 2004, and served by Governor's appointment on the Colorado Securities Board from 1995 to 2000. *See* Expert Report of Professor Lowenstein dated November 10, 2008 ("Lowenstein Repot") (Ex DD, Sealed) ¶ 1 and Ex A (cases where he testified) and Ex B (curriculum vitae). Before preparing his opinion on whether the RLLP interests were securities, Lowenstein reviewed the following documents, many of which are in the record:

1.  Investor Packets, consisting of cover sheet, copy of cancelled check, "Partner Information Sheet," subscription agreement, ballot (electing Gary Harden as Managing Partner), representations and warranties, and appoint of attorneys and certificate of resolution (for partners with accounts at Retirement Accounts & Co.).

2.  Partnership distribution summaries for the various RLLPs.

3.  IRA transfer/rollover form (for partners with accounts at Retirement Accounts & Co.) and similar forms for partners with retirement accounts at other vendors.

4.  The Complaint in this matter.

5.  Excerpts from deposition testimony of [investors] Linda Irwin, Lawrence Youse, Helen Hutchins, June Rice, Faye Dexter, William Wimble, Dorothy O'Neill, Gary Harden.

6.  Declarations of [investors] Robert Haarala, Helen Hutchins, Mary Johnson, June Rice, Russell Hoskin[s], Faye Dexter, Aaron Fatlin, Albert Emery.

7.  Certificates of General Partnership issued to the investors.

8. Cyberspace, Inc.[owned by Harden] – Palancar, LLC [owned by Lowery] agreement of April 22, 1999.

9. Various account statements.

10. Information statement about the RLLPs.

11. Powerpoint or slide presentation or brochure about the investment and internet gambling.

12. Information sheet on Pacific Internet LLC.

13. Explanation of the "four step process."

14. Memoranda of FBI (or FBI/IRS) interviews with Donald Wilson, Linda Irwin, Robert Haarala, Russell Hutchins, Russell Hoskins, Stanley Draper, Edward Hillock, Rene Hillock[.]

15. Form partnership agreements.

16. Various correspondence [sic] from investors.

17. Information and documentation related to Redstone Resources and Funding Corp. and various Redstone "entities."

18. Organizational documentation related to Princeton Holdings, LLC and Palancar, LLC [both owned by Lowery].

19. Complaint forms filed with the Michigan Office of Financial & Insurance Services, Division of Securities, and related information, by [investors] Walter Hinderer, Arlene Youse, Ruth Conley, June Rice, Tom Johnson[.]

20. Various documentation [sic] related to debt collection business and investment partnerships related thereto.

21. Documentation related to complaint of Robert MacGregor against Gary Harden.

22. Agreements between Cyberspace, Inc. [owned by Harden] and Gary Harden and the partners of the various RLLPs regarding distribution of revenues.

23. Miscellaneous correspondence and documentation.

Lowenstein Report (Ex DD) Ex C.

The court finds that Lowenstein reviewed documents of sufficient quantity, substance, and relevance to render him able to render an intelligent opinion, grounded in the specific facts of this case, as to whether the RLLP interests were securities. After carefully enumerating the sound factual assumptions on which he based his opinion, *see* Ex DD ¶ 4, Professor Lowenstein filed a report stating in pertinent part as follows:

Based upon the foregoing, I anticipate offering the following opinions at the trial of this matter:

(a) Limited liability organizations are a relatively new addition to the forms of business organizations available to promoters and entrepreneurs. Essentially, a limited liability partnership is a general partnership in which the individual partners are not liable for the debts or obligations of the partnership except to the extent that a partner expressly assumed a liability or caused an injury to a third party.

Because it is a general partnership, in theory each partner of a limited liability partnership has equal rights to manage the business and affairs of the partnership. However, in practice this may not be the case. Partners may lack the experience, interest or ability to participate in the management of the partnership's business, or they may contract away that right by designating one or more persons to manage the partnership. These qualifications describe the RLLPs; the investor/partners lacked the experience, interest or ability to manage the partnership and, in any event, they designated Harden as the manager. The investors thus by choice and necessity became passive investors in the RLLPs.

Moreover, because the partners in a limited liability partnership are not liable for the debts and obligations of the partnership, they have less of an incentive to be active in the business and affairs of the partnership than do partners in a traditional general partnership.

Thus, while some courts have presumed that an investment in a general partnership is not a security [citing Colorado state court], because the partners have both the right to manage and the incentive to do so, that presumption is not appropriate when the investment is in a limited liability partnership.

(b) An investment in which the investor is passive, that is, invests money in a common enterprise with the expectation that profits will be realize through the efforts of others, is a "security," commonly known as an "investment contract." [footnote 6 citing *SEC v. W.J. Howey & Co.*, 328 U.S. 293, 298-99 (1946)] The investments made by the investors in the RLLPs are investment contracts because:

I.  There can be no doubt that the investors made monetary investments in the RLLPs and that their expectation was that their investments would be pooled to acquire an interest in the profits of internet gambling sites.

ii.  There also can be doubt that despite what the documents signed by the investors may have stated, the investors and the defendants knew that the investors would remain passive, as they did, and would look to Harden, Lowery and their affiliates to realize a profit for them.

iii.  What is important in determining whether an investment is a security for purposes of the federal securities laws is the economic realities of the investment. The reality of this investment is that it was a passive one. At the time of the investment, the expectations of the parties were that the investors would be passive and, in fact, that turned out to be the case. [n. 7 citing Hutchins Dep at pp. 24-27, Rice Dep at p. 27, Dexter Dep at pp. 29-30, unspecified Wimble Dep at pp. 70-71, and date-unspecified interviews of Irwin, Draper, Edward Hillock, and Rene Hillock]

It is appropriate to look to the representations of the promoter when marketing the RLLP interests, not just the documentation. [n. 8 citing *Merchant Capital*, 483 F.3d at 756] Numerous investors testified that Harden told them that "he would take care of everything" (or words to that effect) and that they (the investors) would not have to do anything. [n.9 citing Irwin Dep at pp. 64-66 and date-unspecified FBI interview of Donald Wilson]

(c) Even if, counter-factually, the investors did not cede control to Harden, their investment would still clearly be a security, because the RLLPs themselves were passive. The internet gambling sites – the ultimate source of any return the investors cold hope to realize – were owned and operated by Lowery and entities controlled by, or affiliated with, him [Princeton Holdings, LLC, and Palancar, LLC]. Each RLLP, therefore, looked to Lowery and his affiliates to realize a profit for the RLLP.

Lowenstein Report (Ex DD) ¶ 5. The court finds that Lowenstein had the requisite training, education and experience to testify as an expert on this issue, that he reviewed sufficient documents to intelligently apply general principles to the facts of this case, and that his reasoning is sound and persuasive.

Accordingly, based on Lowenstein's opinion and the factors mentioned above, the court finds that the RLLP interests were securities as defined by the Securities Act and Exchange Act,

satisfying the threshold requirement for application of the statutory and regulatory provisions in question.

The court finds that Lowery has not shown any genuine issue of material fact bearing on the other elements of the section 5(a) and 5(c) claims, either.  Based on the evidence catalogued in detail in the Background section above, it is undisputed that Lowery used interstate means of communication and transportation to offer and sell the RLLP securities, e.g., calling from Colorado to Florida to convince Wimble to invest, faxing documents from Colorado to Harden in Michigan, and traveling from Colorado to Michigan to give sales presentations, which presentations actually resulted in purchases of RLLP interests.  It is also undisputed, as stated in the RLLP documents and SEC records alike, *see* Ex CC (Attestation of Non-Registration), that nobody ever filed a registration with the SEC regarding the Retrieval RLLP interests.

Consequently, the SEC has proven its entitlement to summary judgment on count one.

**Lowery fails to show a genuine issue of material fact as to count two, which asserts a claim under the Exchange Act, 15 U.S.C. § 77q(a), or count three, which asserts a claim under the Exchange Act and Rule 10b-5**, i.e., 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  In both counts, the SEC claims that Lowery, when offering or selling securities through the mail or other means of interstate commerce, employed schemes to defraud, or obtained money by misrepresentations or omissions of material fact, or engaged in transactions or business practices which operated as a fraud or deceit on the purchasers of the securities.

The detailed testimonial and documentary evidence provided by the SEC without effective, specific contest from Lowery (i.e., a contest grounded in specific, cited testimony or evidence of record) leaves no doubt that Lowery obtained money for the RLLPs, hundreds of thousands to

millions of which he diverted for the personal benefit of himself and his wife rather than any arguable tangible benefit to the online casinos or the RLLPs; by making knowingly unrealistic or ungrounded profit projections; by making a buy-back promise that he admits he intended to keep only in certain circumstances (a crucial limitation which he admits he conveniently neglected to convey to Wimble or the other eighty-plus investors); by misrepresenting the amount of money which he had spent, planned to spend, and had the ability to spend advertising and developing the online casinos corresponding to the RLLPs; and by overstating his online-casino experience and implying that he had greater financial resources than he had relative to such projects (e.g., by falsely stating that he was developing three new online casinos per month for himself when he actually only developed six such casinos for himself during the relevant period), *inter alia*. Although the record would definitely permit a finding that Lowery committed these acts with the intent of defrauding and deceiving the investors, the SEC need not prove intent. In our circuit, it is sufficient that the SEC has presented ample evidence from which a factfinder not only may but *must* infer that Lowery was at least reckless with regard to the truth, accuracy, and completeness of his presentations and other statements to investors about the casinos, his experience, his resources, his plans, and what those factors implied about the likely risk and rewards of buying an interest in an RLLP. The record compels the conclusion, undispelled by Lowery, that in making the representations and omissions discussed above, in failing to find arguably-sound statistics or other bases for his profit and market-share projections, and in diverting investor-"partner" capital from the RLLPs and casinos to his personal use without consulting or even informing them, he engaged in "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *SEC v. George*, 426 F.3d 786, 792-93 (6th Cir. 2005).

Consequently, the SEC is entitled to summary judgment on counts two and three.

Lowery's Opposition Brief.

Defendant Lowery, a 77-year-old retired lawyer, is proceeding *pro se* and states that he "is legally blind and has congestive heart failure." Lowery's Opposition Brief filed March 24, 2009 ("Def's Opp") at 1 (citing Letter of Dr. Mark W. Keller, M.D., F.A.C.C., dated September 24, 2008, and Letter of James A. Patterson, M.D., dated November 11, 2008). Notwithstanding sympathy for Mr. Lowery's health problems, the fact remains that his brief does not show a genuine issue of material fact for trial. The brief fails to even address most elements of the SEC's claims against him. For example, Lowery fails to specifically controvert the material factual allegations which establish that the RLLP interests were "securities" for purposes of both the Securities Act and the Exchange Act and that they were not registered.

Once over that threshold, on count one Lowery fails to effectively controvert count one, with the required *specific* citation to the record, and its ample testimonial and documentary evidence establishing that he used means of interstate transportation and/or communication to sell the unregistered securities, a violation of Securities Act section 5(a), codified as15 U.S.C. § 77e(a)(1) ("Sale or Delivery After Sale of Unregistered Securities"). This failure is fatal to Lowery's attempt to reach trial on count one, because it is incumbent on the non-movant to "direct the court's attention to those *specific* portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 250 F.3d 654, 655 (6th Cir. 2001); *see also Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992) ("the designated portions of the record must be designated with enough specificity that the district court can *readily* identify the facts upon which the non-moving party relies'") (quoting *Inter-Royal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.

1989)). *See, e.g., US v. Davis*, 2008 WL 1735167, *4 (E.D. Ky. Apr. 11, 2008) (Edward Atkinson, M.J.) ("Defendant has not provided any specific information regarding who may have been responsible for submission of the CMNs; rather, she simply states that there are 'disputes' regarding who actually submitted the forms. A conclusory statement that a dispute exists, *absent specific citation to the record*, is insufficient to raise a genuine issue of material fact.") (emphasis added) (citing *Morris*); *accord Porter v. Potter*, 2006 WL 1006882, *3 (D. Kan. Apr. 13, 2006) ("*Plaintiff has failed to specifically controvert defendant's statement of fact and to support his own factual assertions with proper citation to the record.* * * * Because plaintiff's response is, for the most part, unsupported by citation to the record, it is insufficient to controvert defendant's motion.") (emphasis added); *US v. Worden*, 2004 WL 2030286, *2 (D. Kan. Aug. 12, 2004) (Sam Crow, Sr. J.) (defendant's opposition brief was insufficient to controvert plaintiff's SJ motion where defendant failed to comply with local civil rule requiring non-movant to "refer *with particularity* to those portions of the record upon which [he] relies") (emphasis added).[5]

Moreover, it is not enough for a non-movant simply to make multiple factual allegations, or challenges to the adversary's factual allegations, and then throw cumulative citations at the end, without specifying the pages where the supporting evidence may be found or tying each citation to a specific allegation or challenge. *See Walton v. Sizemore Sec. Int'l, Inc.*, 2007 WL 1545845, *2

---

[5]

*Contrast Myszka v. Asbury*, 2008 WL 4525415, *4-5 (M.D. Tenn. Oct. 2, 2008) (Aleta Trauger, J.) ("Plaintiff filed a Response to Defendants' Statement of Facts. Though his submission does not conform to the common structure of a memorandum response, it does include the required substantive information [meeting the requirement of] Rule 56 of the Local Rules . . . that '[e]ach disputed fact must be supported by specific citation to the record.' * * * Additionally, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. The undersigned concludes that Plaintiff's filing constitutes an appropriate summary judgment response, particularly in light of the liberal construction his *pro se* status affords.") (citations and internal quotation marks omitted).

n.4 (M.D. Tenn. 2007) (Trauger, J.) ("Presenting multiple facts in one paragraph with cumulative citations at the end does not comply with" local civil rule requiring party on summary judgment to set forth each fact separately and support it with a *specific* citation).

The brief is replete with statements of alleged fact which are immaterial or whose materiality Lowery has not attempted to explain; he usually does not specify which claim or element he is addressing. Specifically, Lowery's brief begins with an implied conclusory assertion that his age and medical condition make it unlikely that he would commit such fraud again. He proceeds to his apparent belief that the SEC should not be issued permanent injunctive relief because it did not earlier seek *temporary* injunctive relief, or because it took too long to investigate and file the instant complaint – both of which are logical and legal *non sequiturs*:

> An injunction is not proper. Lowery is a 77-year-old retired lawyer. Lowery is legally blind and has congestive heart failure. [citation to doctor's letters] Both letters were submitted to counsel for the SEC. To date the SEC has not contacted either Doctor although they have permission to do so.

> What evidence [exists] that there is a reasonable and substantial likelihood that the defendant will engage in future illegal conduct?

> The alleged violation started in 1999. The SEC filed an initial inquiry over four years prior to filing the complaint on May 19, 2005.

> During this period SEC alleges no further alleged violations. The SEC has not in this period from 1999 to 2008, nine years, asked for a temporary injunction against Lowery.

> SEC alleges that the RLLP's were purported Colorado registered limited liability partnerships.

Def's Opp at 1.

Lowery spends much time seemingly trying to show that the largest RLLP investor, William Wimble, was sophisticated and experienced, did not rely on Lowery's representations as an

inducement to invest, and did not rely on Lowery's expertise for his expectation that the casinos would earn a profit and provide a return on his investment. Lowery writes as follows, in part,

All sales projections based on legitimate reports copied by Wimble and sent to his group. – Exhibits – [no citation provided]

Investors not passive. See notes from Wimble and his phone call. [no citation provided]

Plaintiff relies on the statements and testimony of Mr. Bill Wimble to substantiate its motion again[st] Lowery. However, Wimble's statements and testimony is [sic] so contradictory and inconsistent as to be incredible.

SEC alleges that Lowery met several times with one Florida investor [Wimble]. Plaintiff alleges that Lowery spoke at least 10 times in the course of time selling RLLPs interest [sic] to him. But see A's Exhibit _____ [sic, no citation provided] Wimble had already purchased RLLPs before he had met Lowery. The petition [sic] alleges that Lowery was attempting to cover up his role in selling of the RLLPs interest [sic]. (See Wimble's notes of Seminar Lowery Exhibit 31 and 32 dated the first day of April 1999, which describes in detail Lowery[']s statements at the seminar.)

Commission alleges that the investment was passive. (See exhibit attached showing Wimble's interest and involvement [no citation provided] [)] Commission alleges that the Court should ignore the language in the agreements and conclude[] that the structure was that of a limited partnership. Ignoring the fact that the sites were sold to the individual RLLPs. The Commission ignores the fact that a vote was held to determine when the proceeds would be sent to Palancar [LLC, Lowery's company] and for what casino. [no citation provided]

Commission alleges that Lowery made multiple material representations and omissions. Lowery did not draft any RLLP materials with baseless and overly optimistic profit projections. [no citation to documents suggesting sources or arguably-reliable bases for any revenue or profit projections which Lowery or the pair's sales material conveyed to investors]

The commission alleges that Lowery told Wimble that casino sites would make $500,000 to $1 million per month. Wimble continually got "play" and "net drop" confused.[6] Wimble is the one that [sic, "who"] advised Lowery and the investors

---

[6]

As the SEC correctly notes,

that the casino market was a $3 trillion market (Government Exhibit 296 [?]) and he got his information from Bear Stearns (Government Exhibit 228 [?]), Business Week (Government Exhibit 296 [?]) and MultiMedia (Government Exhibit _____ [sic]). Commission cannot point to any baseless and overly optimistic profit projections, in fact Wimble's notes (Seminar notes Defendant Lowery Exhibit 28) it was impossible to predict income (See Defendant Lowery Exhibit 28).

Commission asserts that Lowery told Wimble that he possessed two trust funds totaling one billion [dollars] but see Wimble's own notes attached [no citation provided] as Wimble says Harden told him [that] Lowery's wife had two trust funds totaling a billion [a]piece.

* * *

Wimble spoke of software developers.[7] (Defendant Lowery deposition Exhibit 2, March 30, 2007, page 39, line[s] 7 through 16.)

Wimble states in his deposition of March 30, 2007 that he was unable to create an account (Defendant Lowery Exhibit 4, lines 13 through 23 – lines 1 through 12 [sic].)

Wimble was a sophisticated investor (Defendant Lowery Exhibit 4A, p. 10) of [sic] (Wimble's deposition, February 9, 2007, p. 10, lines 1 through 12 and 18 through 22.)

Wimble had invested in Internet casinos before he had met Lowery. (Defendant Lowery Exhibit 5, pp. 34, 35, 36, 37) (Wimble's deposition of February 9, 2007, lines 9 through 25, p. 35, lines 1 through 4.)

---

Lowery's attorney was present at Wimble's deposition when Wimble testified that Lowery told him each casino would make between half a million to a million per month and would corner 50% of the on-line [gambling] market, and had an opportunity to examine Wimble and correct any purported confusion.

P's Reply at 7 n.16. Moreover, as noted *infra*, none of these claims require proof that Wimble or any other investor actually relied on Lowery's representations regarding projected profits or projected or anticipated market share. *See Blavin*, 760 F.2d at 711.

[7]

As the SEC correctly notes, *see* P's Reply at 4 n.4, the mention in Wimble's deposition of software developers cannot be read to refer to his own negotiation with, or selection of, software developers for the RLLPs and/or the RLLP-associated casinos. Rather, the cited excerpt from Wimble's deposition shows only that Wimble was concerned that a software dispute might delay or prevent a potential sale of the casinos which could yield funds for the investor-"partners." *See id.* (citing Lowery Exhibit 2 at lines 17-25).

Wimble relied on a Bear Stearns report in making his decision to invest in internet casinos. (Gov. Exhibit 228, p. 2 of Wimble's letter dated [M]arch 23, 2001)[.]

Wimble says, "his notes are direct quotes." (Defendant Lowery Exhibit 6, Wimble's deposition of February 9, 2007, pp. 39, 40, and 41, p. 39 - lines 1 through 14 and lines 20 through 25 and p. 40 - lines 11 through 18.)

"Wimble knew that Harden was purchasing a percentage of the net drop." (Wimble's deposition of February 9, 2007, p. 44, Defendant lowery Exhibit 7, lines 4 through 12.)

Wimble knew that when "his partnership was purchased from Harden he would be purchasing a percentage of a net drop." (Wimble deposition of February 9, 2007, p. 45, Defendant Lowery Exhibit 8, lines 3 through 13 and lines 18 through 25.)

Wimble wanted to be in control (Wimble deposition of February 9, 2007, Defendant Lowery Exhibit 9

Wimble does not recall today precisely what Lowery's statements were. (Defendant Lowery Exhibit 10, lines 8 thought [sic] 19.)

Wimble had seen the 99-year phone lease. [??] (Defendant Lowery Exhibit 11, line 5 and item 9.)

Wimble has no reason to believe that Lowery's statements were made in bad faith (Defendant Lowery Exhibit 12, line 3 through 7.) Wimble advised [whom?] and everyone [sic] knew this was a risk[y] investment (Defendant Lowery Exhibit 12A of February 8, 2007, p. 121, lines 5 through 7. At the time Lowery's statements were made he believed it [sic] was the truth. (Defendant Lowery Exhibit 12B of February 8, 2008, p 58, lines 12 through 17.)

* * *

No one guaranteed Wimble that the investment was a sure thing. He was told this investment was an unknown thing (Defendant Lowery Exhibit 15, p. 78, lines 12 through 16.) Wimble knew that on March 31, 1999 that if play on the casinos had not reached 2 million [dollars? Per casino? Per a certain time period? Revenue or profit?] there would be no profit. (Gov. Bates stamp 000130) (Defendant Lowery Exhibit 15A)

Wimble had read everything possible and there was nothing to guarantee him anything (Defendant Lowery Exhibit 15, p 78, lines through 25.)

No one told Wimble that his investment in the partnerships was a sure thing (Defendant Lowery Exhibit 15, p 79, lines 15 through 17.)

Wimble thought that Harden or Lowery had done some projections on what the return could be but no one guaranteed any return (Wimble's deposition of February 9, 2007, Defendant Lowery Exhibit 116, Wimble's deposition of February 9, 2007, p. 83, lines 14 through 22) and he understood that the projections were assumptions only

* * *

Wimble believed that some of the purveyors were being paid out of the net drop. He knew this was true in some cases (Defendant Lowery Exhibit 19, Wimble's deposition of February 9, 2007, p. 96, lines 9 through 13.)

"Wimble was a part of the inner circle and that Lowery was always available to him." (Defendant Lowery Exhibit 20, Wimble's deposition of February 9, 2007, p. 108, lines 8 through 11 and 16 through 18.)

He thought that Lowery worked hard to make the casinos work (Defendant Lowery Exhibit 20, Wimble's deposition of February 9, 2007, line[s] 8 through 23.)

Wimble named his own casinos and approved the graphics (Defendant Lowery Exhibit 21, Wimble's deposition of February 9, 2007, p. 111, lines 1 through 4 and lines 16 through 20 and p. 112, lines 13 through 17.)

Wimble suggested that Lowery download the Bear Stearns article (Defendant Lowery Exhibit 22, Wimble's deposition of February 9, 2007, p. 2, 4th paragraph.)

Lowery showed Wimble's wife how to get a newsletter off the web (Defendant Lowery Exhibit 25, November 16, 1999, date, paragraph 1.)

Wimble was aware of problems that existed in internet gambling (See FAX to Lowery[,] Defendant Lowery Exhibit 27.)

Wimble knew it was not possible to make estimates of unprojected income [sic]. (Wimble's notes Defendant Lowery Exhibit 28, lines 1 and 2, and last paragraph.)

Wimble did due diligence of the internet casinos (See p. 6 of his newsletter, Defendant Lowery Exhibit 29, last 3 paragraphs.) (Gov. bates stamp 001817)

Wimble advised Lowery 11-22-00 of his interest in the casinos (Defendant Lowery Exhibit 30.)

* * *

Wimble states there are between 280-300 sites now [??] (Defendant Lowery Exhibit 32, line 1 of middle section. Also see Gov. V001933 [?].) Wimble was told probably not 500 profitable out of 4,000. [No citation provided]

Wimble threatened Harden with going to the SEC if Harden didn't comply with his

demands. (Gov. bates stamp 000644, Defendant Lowery Exhibit 33, p. 4, lines 13 through 21.) [Relevance?]

Wimble bragged that he couldn't type and did not know how to turn on a computer (Gov Exhibit 96, lines 1 and 2.) [Relevance?]

Harden and Wimble had side agreements that did not include Lowery (Gov. Exhibit 97 and 98.) [Relevance?]

Lowery advised Wimble 2-3-00 not to sell more sites [?] that Lowery needed to concentrate on the project. (Gov. Exhibit 118, p. 1, paragraphs 2 and 3, and 7.) [Relevance?]

Wimble discussed with the RLLPs whether we should take bets in the USA. (Gov. Exhibit 125, all paragraphs.) [Relevance?]

Wimble did his own due diligence on the Sultan [sic] of Mindanao [Mindanao is a large island in the south of the Philippines]. (Gov. Exhibit 160, 161, 163 and 164, p 2, paragraphs 2, 3, 4.)

8-13-01 Wimble wanted the definition of net win or net drop. (Gov. Exhibit 198, first line and middle of page.)

Wimble wrote his own assumptions (see his notes of 11-19-01, Gov. Exhibit 250.)

Purchase and sales contracts between [Harden company] Cyberspace Inc. and Palancar [LLC, Lowery's company] (Gov. Exhibit 264) signatures. [Relevance?]

Wimble knew of Palancar's ownership of 6 sites. (Gov. Exhibit 266, last paragraph.) [Relevance?]

Wimble and Harden had their own side agreements (Gov. Exhibit 268, lines 1 and 2, and signatures.) [Relevance?]

Wimble and Harden had long negotiations regarding their agreements (Gov. Exhibit 269, 271, 281 and 282, greeting, paragraph 1 and signature.)

Cyberspace and Palancar had an agreement that referred to the "monthly net revenue drop". Wimble had apparently negotiated 3% for himself. (Gob. Exhibit 285, p 1, lines 5 through 8 of recitals, p. 2 last 2 paragraphs.)

Wimble believed in the internet gaming casinos and encouraged his partners to invest (Gov. Exhibit 294, p. 4, under paragraph 5, lines 1 through 4.)

Wimble relied on an article in Business Week and not on any representations made by Lowery (Gov. Exhibit 296, p. 1, paragraph 4, p. 2, paragraph[s] 1 & 2, and Plaintiff Exhibit 19) and advised investors in a first quarter 2000 report that internet gambling revenue will reach 3 trillion worldwide in 2002 [no citation provided]. [Relevance?]

Wimble continued to send investors news articles that he obtained (Gov. Exhibit 297, casino updates, paragraphs 3, 6 and 7.) [Relevance?]

Wimble and Harden had continual disagreements (Gov., Exhibit 318, p. 1, paragraph 3.) [Relevance?]

Apparently Wimble purchased interest directly from Harden and not through the RLLPs. (Gov. Exhibit 333, signing of check) (Gov. Exhibit 319, p. 3, first and last paragraph, p. 4, first paragraph.)

Wimble desired to take over all the RLLPs. (See his letter to his investors by placing his personal CPA as managing partner (Gov. Exhibit 319, p. 3 and 4) [Relevance?]

Def's Opp at 2 and 3-7. (Between this excerpt and the other excerpt, the court has reproduced verbatim almost all of Lowery's seven-page opposition brief.)

Lowery presumably intends this to show a genuine issue as to whether the RLLPs interests were "securities" (germane to all three counts), and a genuine issue as to whether he obtained money by "misrepresentations or omissions of material fact" or "engaged in transactions or business practices which operated as a fraud or deceit on the purchasers" (germane to counts two and three under 15 U.S.C. § 77q(a), and 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, respectively). But even accepting as true all of Lowery's allegations regarding his interaction and communications with investor Wimble, many of Lowery's carefully-worded denials, qualifications, and allegations do not show a genuine issue as Lowery seems to think. For one thing, mere assertions by a party or his counsel are not evidence. All the statements in Lowery's brief regarding Wimble which are not supported by any specific citation to the record are nothing more than Lowery's subjective beliefs and have no evidentiary value, e.g., Lowery's conclusory assertions that he sent legitimate reports

to Wimble which supported the profit projections, that the investors were not passive, that Lowery did not speak with Wimble ten times, that the investor-partners voted on whether to deposit certain funds with his company Palancar on behalf of or somehow on the account of certain RLLPs, and that Wimble was told that Lowery's wife rather than Lowery had access to $1 billion or more in trust funds.

Moreover, Lowery's allegation that "Wimble is the one that advised Lowery and the investors that the casino market was a $3 trillion market" does nothing to address the SEC's evidence that Lowery told Wimble that the casinos underlying the RLLPs would corner half of that market. Lowery is careful not to deny that he made the market-share statement, and he makes no attempt to supply data or any other basis he allegedly had at the time for making the statement. Similarly, Lowery's allegation that Wimble told him it was "impossible to predict income" from the RLLPs does not address the SEC's evidence that Lowery conveyed rosy projections, with no apparent solid basis at the time for them, to prospective and actual investors other than Wimble.

More broadly, even if all of Lowery's allegations about Wimble and their communications are true, that does nothing to alter the other, undisputed facts showing that the *dozens of other investors* relied on the expertise of Lowery and Harden instead of their own experience or expertise to run the casinos and RLLPs respectively, detrimentally relied on Lowery's material representations and omissions in buying the RLLP interests (including the baseless profit projections),[8] and that they

---

[8]

In any event, unlike a private litigant seeking damages, when the SEC brings an action under anti-fraud provisions of the federal securities laws, it need not prove that any investor actually relied on such misrepresentations or omissions. *See SEC v. Fisher*, 2008 WL 822135, *2 (E.D. Mich. Mar. 27, 2008) (Rosen, J.) (citing *Blavin*, 760 F.2d 706, 711 (6th Cir. 1985)) and *SEC v. Smith*, 2005 WL 2373849, *7 (S.D. Ohio Sept. 27, 2005) (Frost, J.) (citing *Blavin*), *aff'd*, 208 F. App'x 402 (6th Cir. 2006) (p.c.) (Daughtrey, McKeague, D.J. Reeves). Nor does the SEC need to prove that the misrepresentations or omissions caused any investor to lose money, *see Blavin*, 760 F.2d at 711

were deceived and defrauded by some of his business practices as described above.

Next, Lowery challenges the SEC's contention that he misappropriated investors' funds, but the basis for the challenge is unclear at best. He states only that he and his wife "put in between 600 and 700 thousand into Palancar [LLC, Lowery's company]." Def's Opp at 2. First, Lowery does not provide any evidence of such personal investment into or expenditure on Palancar. Even if there were evidence of such unreimbursed personal investment into Palancar, Lowery does not deny the SEC's competent evidence that he and his wife spent hundreds of thousands of dollars of investor capital on buying a home, paying their own personal taxes, traveling around the world, staying in upscale hotels, and enjoying massages and/or personal trainers. Nor does Lowery identify any documentary evidence to corroborate the allegation that the Lowerys put $600-700,000 into Palancar, let alone any evidence that such deposits were large enough to compensate for the larger sums that were diverted to their personal use. Nor does Lowery identify bank statements, check copies, or other potentially-admissible business records which could account for all of the $4.5 million which the SEC alleges (without contradiction) was transferred into Palancar's account(s) and then on to Princeton Holdings LLC's account(s).

Throughout the entire brief, Lowery fails to cite any case law or other legal authority for his explicit and implicit propositions. For example, Lowery has not identified, nor has the court located, any case where a court denied summary judgment to the SEC on a similar record – a record of largely unrebutted evidence of material misrepresentations, material omissions, large-scale diversion of investors' capital to purposes wholly unrelated to their investment and "partnership" agreement, operation and control of an entity that contradicted the recitations in the offering documents and the

_____

(citing, *inter alia*, *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963)).

purchase documents, and the offering and sale of unregistered interests which clearly qualified as securities under the Securities Act and the Exchange Act.

**Even those few points in Lowery's opposition brief which are coherent, relevant, and potentially meritorious do not alter the propriety of summary judgment.**

First, Lowery disputes the SEC's allegation that the reason he blackmailed Harden to destroy the videotape of Lowery's sales presentation was to cover up misleading or fraudulent statements, projections and tactics. Lowery follows, however, with matters that seem unrelated:

> Lowery did not try to cover up video by blackmailing Harden. It was used to allow a misdemeanor plea in USA vs Lowery. Wimble notes show clearly what Lowery said at seminar. SEC alleges RLLP[s] were passive investments but see pages of Wimble notes attached hereto.

Def's Opp at 1-2. This "argument" does not offer any other possible, innocent explanation for taking such an unusual action (demanding, on threat of serious adverse action, that someone destroy a videotape of his own common, publicly-delivered sales presentation). Therefore, the court could hold that no reasonable factfinder could reject the SEC's explanation for Lowery's blackmailing of Harden, as it remains the only identified possible explanation. Nonetheless, because Lowery is opposing summary judgment, the court is bound to accept his version of events (at least where it is not contradicted by his own deposition or investigative testimony). Accordingly, the court has assumed that whatever Lowery's motivation for blackmailing Harden to destroy the videotape, it was *not* to cover up evidence that he made materially false, misleading, or fraudulent statements, employed projections that he knew were unrealistic, or employed misleading tactics.

Second, Lowery disputes the SEC's allegation that he told major investor William Wimble that he had an interest in, or access to, a $2 billion trust fund. Lowery writes as follows,

Wimble in his deposition of March 30, 2007 (Defendant Lowery Exhibit I), stated

-41-

> Lowery told him he had 2 trusts worth 2 billion dollars, but Harden told Wimble that Lowery's wife had 2 billion dollars. (Defendant Lowery Exhibit 1, p 34, lines 8 through 13, and Gov. Exhibit 165).

Def's Opp at 3. A reasonable factfinder could conclude that Wimble either lied or made an honest mistake when he testified that Lowery told him that he had access to $2 billion. The factfinder could find, for instance, that Wimble simply had a faulty recollection, and that it was Harden who mentioned the trusts rather than Lowery, and that Lowery's wife was the alleged trust billionaire rather than Lowery. Out of an abundance of caution, the court will assume for purposes of this motion that nobody ever told Wimble or any other investor that Lowery himself had an interest in, or access to, $2 billion or trust funds approaching that amount.

Third, Lowery alleges that at a particular sales presentation in Grand Rapids, Michigan, he discussed only the online casinos and not the RLLPs themselves. For purposes of this motion, the court assumes that this is true. Nonetheless, it is immaterial. For one thing, Lowery does not say that he did not discuss and directly "pitch" the RLLPs at other presentations and meetings. For another things, as the SEC points out, *see* P's Reply at 3 n.2, the fact that Lowery touted his own current or intended future development and operation of the casinos tends to undermine his claim that the investors were not "passive" and did not rely on his expertise rather than their own in deciding to buy the RLLP interests (and therefore, that the interests were not "securities"). More importantly, the record compels the conclusion that Lowery intended his part of the sales presentation to induce people to buy RLLP interests, and that they did in fact rely on those presentations in deciding to buy. Lowery has not identified what possible purpose he might have had in delivering the "casino portion" of the RLLP sales presentations if not to help Harden convince people to buy into those very RLLPs – which, as everyone knew, would earn a return for

the investor-"partners", if at all, if and if only if the casinos Lowery "pitched" were profitable.

Fourth, Lowery denies the SEC's allegation that he is a former "securities law attorney." Def's Opp at 7. The court has made no finding regarding Lowery's former areas of expertise during his time practicing as an attorney. For purposes of this motion, the court will assume *arguendo* that Lowery never specialized in or even practiced securities law.

Nonetheless, even excluding the SEC's allegations and evidence regarding the inference to be drawn from Lowery's blackmailing Harden to destroy the videotape, and Lowery's access to a $1-2 billion trust, and assuming that Wimble was a sophisticated investor with knowledge and experience in the online-gaming field, and that Lowery was not a securities lawyer, the uncontroverted evidence which remains leaves no genuine issue as to the elements of the SEC's claims. As the SEC correctly notes, *see* P's Reply at 5, it is entitled to summary judgment if Lowery fails to show a genuine issue as to even a single material misrepresentation or material omission, or a single deceptive or fraudulent business practice or tactic. Lowery has not shown such a genuine issue, and "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record," *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992) ("What principle of judicial economy is served when judges . . . are required to do the work of a party's attorney [or a party]?"), and the court cannot act as an advocate for *pro se* parties – even a physically infirm *pro se* party – by articulating, developing, or substantiating arguments with specific relevant evidence and authority when the party himself has not done so.[9]

---

[9]

It may be a daunting task for many *pro se* litigants to marshal evidence and provide proper, specific citations to a voluminous record, evaluated under the governing substantive law, as required to show a genuine issue of material fact. But it is not impossible. *Cf., e.g., Waford v. Mudd*, 2005 WL 1712445, *2 n.2 (E.D. Ky. June 27, 2005) (Wehrmann, M.J.) ("Although plaintiff proceeds *pro se* in this federal proceeding, his pleadings include proper citation to relevant case law and the

**Finally, Lowery's opposition brief asserts,**

> Commission argues that they have met the standard for summary judgment but they have completely ignored the Honorable Richard Alan Enslen[']s order of January 12th, 2006 that the affirmative defense of limitations under 28 U.S.C. [sic] may apply [document #63, where Judge Enslen denied the SEC's motion to strike the limitations defense]. The order is attached hereto as based on [SEC records reviewer] Kurr's declaration dated 11-14-2005 and Commissions' [sic] reply to strike Lowery's defense it is obvious that the statute of limitation[s] applies.

Def's Opp at 2-3. But this belated, cursory invocation of a possible statute-of-limitations defense is unavailing. If Lowery believed that the statute of limitations bars the SEC's claims, he could and should have filed a motion seeking dismissal or summary judgment on that ground. Having failed to file such a motion (or seek an extension of time in which to do so), Lowery cannot raise the limitations defense now in opposition to the SEC's summary-judgment motion. In any event, even if a brief in opposition to a dispositive motion were a suitable and timely vehicle for raising a limitations defense not raised on Lowery's own motion, he has provided no case law, let alone applied the law to the facts of this case, to allow the court to conclude that the SEC's claims are time-barred. Lowery has waived any limitations defense that he may have had.

## ORDER

Pursuant to FED. R. CIV. P. 56, plaintiff's summary judgment motion [# 138] is **GRANTED**.

As claimed in count one, the court **DETERMINES** that defendant Lowery violated Securities Act sections 5(a) and 5(c) (codified at 15 U.S.C. §§ 77e(a) and 77e(c)).

As claimed in count two, the court **DETERMINES** that defendant Lowery violated Exchange Act section 17(a) (codified at 15 U.S.C. § 77q(a)).

---

attachment of numerous relevant exhibits. Petitioner's pleadings are extensive; his petition alone spans more than 70 typewritten pages, including exhibits."), *R&R adopted*, 2005 WL 2175528 (E.D. Ky. Sept. 8, 2005) (Hood, J.).

As claimed in count three, the court **DETERMINES** that defendant Lowery violated Exchange Act section 10(b) (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

**Defendant Lowery** is hereby permanently enjoined from violating the Federal Securities Laws, including but not limited to:

1.      Securities Act sections 5(a) and 5(c) (codified at 15 U.S.C. §§ 77e(a) and 77e(c)).

2.      Exchange Act section 17(a) (codified at 15 U.S.C. § 77q(a)), and,

3.      Exchange Act section 10(b) (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

**Lowery SHALL DISGORGE** all monies or things of value which he or his companies, agents, successors, or assigns obtained through the violations described in the complaint.

**In the absence of an agreement of the parties,**

This matter is **REFERRED** to the Magistrate Judge for determination of the following:

–      whether Lowery should pay "Third Tier Civil Monetary Penalties" under Securities Act section 20(b) (15 U.S.C. § 77(d)) and Exchange Act section 21(d)(3) (15 U.S.C. § 78(u)), and if so, how much;
–      the principal amount of unlawfully-obtained monies to be disgorged;
–      the prejudgment interest, if any, which is due on said disgorgement;[10]
–      any other damages, civil penalties, attorneys' fees or costs which the Magistrate Judge may determine are appropriate.

In proceedings before the Magistrate, Lowery will be precluded from doing the following:

–      arguing that he did not violate the federal securities laws as claimed in the complaint;

---

[10]

*See, e.g., US v. Madoff*, 2009 WL 721712, *2 (S.D.N.Y. Feb. 9, 2009) (directing calculation of prejudgment interest "from the date of the first violation, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2).").  The SEC contends that prejudgment interest from May 2001 (the month after the last investment was made in the RLLPs) through the end of January 2009 should be about $2.7 million. *See* Kurr Dec ¶ 2b and its Attachment I.

–    challenging any of the factual findings made in this opinion, or urging factual findings or premises inconsistent with this opinion;

–    challenging any of the factual allegation made in the complaint or in the SEC's opening brief on summary judgment, if he did not specifically (with a citation to the record) challenge that allegation in his brief opposing summary judgment;[11]

The Magistrate Judge may order discovery from parties and appropriate non-parties.

This is <u>not</u> a final and appealable order.

Final judgment will not issue until the amounts due have been determined.

**IT IS SO ORDERED** on this __15th__ day of July 2009.

/s/ Paul L. Maloney_____

Honorable  Paul L. Maloney

Chief United States District Judge

---

[11]

*See Madoff*, 2009 WL 721712 at *2 (imposing similar conditions on defendant found to be liable for violation of these same federal securities laws).